(No. 21133.—

HUGH H. BOLTON, Appellant, *vs.* MARTIN J. WHALEN, Appellee.

*Opinion filed October 22, 1932.*

D. R. ANDERSON, for appellant.

SNAPP, HEISE & SNAPP, EDWARD R. NADELHOFFER, and MARTIN K. MILLER, for appellee.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

The city of Joliet, in Will county, adopted the commission form of municipal government in the year 1915. At a primary held in the city on March 3, 1931, the appellant, Hugh H. Bolton, Robert J. Cronin, David J. Emery, John K. Jeffrey, Joseph E. Kochevar, Samuel E. Shepley, Martin J. Whalen and Robert Wraith were nominated for the four offices of commissioner. The election was held on April 21, 1931, and on the next day the official canvass of the returns from the eighteen election districts or precincts of the city disclosed that Shepley, Wraith, Emery and Whalen, in the order stated, stood first, second, third and fourth in the total numbers of votes received and that there had been cast for them respectively 13,209, 9752, 8219 and 8053 votes. Accordingly they were declared elected. Upon the canvass, Bolton was credited with 8019 votes, and, among the unsuccessful candidates, stood highest in the number of votes received. He filed a petition in the county court of Will county to contest the election. The petition was amended. Two answers were filed,—one by Whalen and the other by Emery, Shepley and Wraith, and these answers were followed by a replication. The petition was taken as confessed by Cronin, Jeffrey and Kochevar. During the progress of the hearing the parties stipulated that Emery, Shepley and Wraith had been elected and after a re-count of the ballots and the introduction of considerable evidence, the court found that unauthorized persons

had been afforded access to the ballots; that, after the canvass of the votes, crosses not made by the voters had been placed before the name of the petitioner on a number of ballots from two election districts, and that the returns made by the officers of election were true and correct and, as evidence of the result of the election, were entitled to greater weight than the ballots. The court adjudged Whalen elected to the remaining office of commissioner and dismissed Bolton's petition. From that judgment the latter prosecutes this appeal.

The ballots and returns from sixteen election districts were delivered to the city clerk late on the day of the election. He received them from the two remaining districts early the following day. His office was located on the second floor of a bank building in the principal business district of Joliet. The city leased that floor and it was occupied not only by the office of the city clerk but also by the offices of the mayor, commissioners, city collector and building commissioner, the council chamber, an information bureau and a storeroom. A corridor ran from east to west and turned south near the southwest corner of the building. North of this corridor and near the east end of the building was a large room set apart for the city clerk and the city collector as their combined office. A door in the east wall of this room opened into the office of commissioner Shepley. Between the south wall of the latter's office and the north wall of the corridor, the city clerk's vault was located. The door to the vault was in the south wall of the commissioner's office and the vault could be entered only through that office. Near the southwest corner of the same office a door opened into a hallway which, for a short distance, adjoined and ran parallel to the corridor. From this hallway admittance was gained to the offices of the mayor and commissioners Shepley and Wraith as well as the office of commissioner Emery. A door in the south wall of the hallway opened into the corridor and

practically opposite this door and at the point where the corridor turned south, the storeroom was located. The door to the storeroom was in the north wall of the room, which was the south wall of the corridor; the room had no windows and it was lighted by two electric lamps. At the southwest corner of the second floor, west of the corridor and opposite the south end of the storeroom, was the office of Whalen, the appellee. It had been occupied by Bolton, the appellant, Whalen's immediate predecessor, and it was entered directly from the corridor.

Upon the delivery of the ballots and returns to the city clerk, he deposited them in the vault of his office. He took them from the vault so that the official canvass might be made and, when that purpose had been served, he returned them to the vault. For the lack of space in the vault, the clerk, on the day after the canvass, transferred the ballots and returns to the storeroom. Shortly thereafter he heard rumors of a contest of the election and for that reason, on the fourth of May, he took the ballots and returns from the storeroom and returned them to the vault. The door to the vault was locked when the office was closed. During the time the ballots and returns were in the vault, the city clerk was the only person who understood the operation of the combination lock to open the vault door. No person other than the city clerk and his deputy had access to the vault.

The storeroom was the depository of stationery and supplies used by the officers and employees of the city. A table stood in the center of the room. The door to the storeroom was self-locking and was kept closed. A key to the lock, however, hung on the wall in the city collector's office and in the public view, was available for use by the collector, the city clerk and their assistants. Master keys to unlock the doors to the municipal offices and the storeroom were carried by the mayor and certain commissioners. On May 4, 1931, when the appellee entered upon the dis-

charge of his duties as a commissioner, the appellant gave him one of these keys. The doors at the street entrance to the building were never locked; the second floor could be reached by a stairway and an elevator, and any person who had a master key or had obtained custody of the key in the collector's office could gain admittance to the storeroom.

Upon the filing of the appellant's petition to contest the election, the county court, on May 12, 1931, appointed the county clerk the custodian of the ballots and returns. Pursuant to this appointment, the city clerk delivered the ballots and returns to the county clerk and the latter deposited them in the vault of his office. The vault was used exclusively by the county clerk and that officer and his two deputies were the only persons who had knowledge of the combination to the lock and could open the vault door. The ballots remained in this vault until they were counted in court and the county clerk and one of his deputies testified that no person not connected with the office entered the vault during that period.

The evidence showed irregularities by the judges and clerks of election in several districts. A number of ballots cast in one district bore the surname instead of the initials of a judge of election. In certain districts the ballots were divided into three piles and the votes in each were counted by a judge and tallied by a clerk. The three results credited to each candidate were then added together to ascertain his total in the district. Several clerks first tallied votes on sample ballots and then transferred the tallies to the sheets provided for that purpose. In certain districts erasures and corrections of figures appeared on tally-lists and in poll-books. The signature of the officer administering the oath of office to the judges of election was omitted from certain poll-books. To save time, the judges of election in certain districts signed the poll-books before the polls were closed, and in a majority of the districts the ballots were not folded before they were strung on a wire. There was no

proof, however, of any want of good faith or of fraudulent conduct on the part of the judges and clerks, while there was testimony by watchers, as well as judges and clerks, that in every district the ballots had been correctly counted.

The ballots, tally-sheets and poll-lists and the testimony concerning them disclosed the following facts: In the first district a small number of ballots were separated from the rest, and the wires which ran through them were twisted together but the ends were not sealed. One of the judges could not tell whether the ballots were in the same condition as when they were fastened together immediately after the election. The seal on the sack of ballots from the second district had been crushed to such an extent that no evidence of a seal remained. The ballots from the third district disclosed no change. In the fourth district one hundred ninety tallies were erased but the erasures were not made by a clerk of election. Twenty-six ballots were strung on a wire and separated from a much larger number. The ballots were not folded. The re-count showed that the number of votes the appellee received was one hundred fifty-three less than the returns gave him, while the appellant's total remained the same. All the votes cast in the fourth district for the several candidates for the office of commissioner were then counted and no material change in the totals as shown by the canvass, other than the appellee's, was found. From fifteen to twenty watchers followed the counting of the ballots in this district and judges, clerks and watchers testified that the ballots had been correctly counted and the totals accurately returned.

No tampering with the ballots from the fifth district was shown. The re-count of the ballots from the sixth district credited the appellant with ninety-two votes in excess of the number the returns disclosed. An inspection of the sack from which the ballots were taken revealed that it had been re-sewed and re-sealed. Three of the seals at

the top consisted of dark-brown wax over lighter-red wax. Two ballots were torn from the wire upon which they, with other ballots, had been strung. The ballots were not folded and the wire was twisted and not sealed. Peculiar to the candidacy of the appellant, each of a number of ballots had a cross in the square before his name discernible from the back of the ballot. The judges, clerks and a number of watchers, testified that the count of the ballots and the returns, certified on the evening of the day of the election, were correct.

No evidence was introduced tending to show any alteration of the ballots from the seventh district. The re-count of the ballots from the eighth district gave the appellant sixty-six votes in excess of the number credited to him by the judges and clerks of election. The evidence shows that after the polls closed and while from eight to fifteen watchers were present, the judges of election counted and the clerks tallied every ballot correctly. Upon the re-count it appeared that the original seals on the sack, which bore an imprint, had been broken, and that a sealing wax darker in color had been substituted. Part of the string which closed and tied the sack was above instead of below the sealing wax. The ballots were clean when the judges put them into the sack but on the re-count it was discovered that some were soiled and bore finger prints. The wire holding the ballots was broken. It was apparent that the ballots were not in the same condition as when the sack containing them was sealed.

The ballots from the ninth district were not folded and the names of the appellant and the appellee were accessible without breaking the wire upon which the ballots were strung. In the tenth district, the ballots were not strung upon a wire. A judge from this district and another from the eleventh district testified that they could not tell whether the ballots from their respective districts were in the same condition as when they were sealed. There was, however,

no evidence of any unlawful interference with the ballots from these three districts.

In the twelfth district the ballots were not strung upon a wire, but were bound in a package by a copper wire and a cord. The seal was broken. One of the judges of election testified that the wire did not appear to him as it did when he twisted the ends. The wax on the sack of ballots from the thirteenth district bore the imprint of a seal affixed by the judges of election but this imprint did not appear on the re-count. The manner in which the sack had been fastened by the judges of election was in dispute and the re-count showed one ballot less than the returns. There was no proof that the ballots from the fourteenth, fifteenth, sixteenth, seventeenth and eighteenth districts had been tampered with except that the seals on the sacks from the fifteenth and eighteenth districts were broken.

The question presented is whether the ballots shall prevail over the returns made by the election officers. The consideration of that question necessitates the inquiry whether the integrity of the ballots was preserved or whether they were so exposed to the reach of unauthorized persons that they may have been tampered with or changed. If, upon the production of the ballots in court, it clearly appears that they are in the same condition as when they were counted by the judges of election, the re-count made by the court must prevail, and any discrepancies in the votes certified will be attributed to the errors of the election officers. (*Strubinger* v. *Ownby,* 290 Ill. 380). If, however, the evidence shows that the ballots were exposed to the reach of unauthorized persons, and the returns are not discredited, the ballots will not be regarded as better evidence of the result of the election than the returns. (*Graham* v. *Peters,* 248 Ill. 50; *Caldwell* v. *McElvain,* 184 id. 552; *Bonney* v. *Finch,* 180 id. 133; *Eggers* v. *Fox,* 177 id. 185; *Beall* v. *Albert,* 159 id. 127; *Murphy* v. *Battle,* 155 id. 182). Actual tampering with the ballots need not be shown, but it is

enough, to invalidate them as evidence, that the opportunity for unlawful interference with them was afforded. (*Rottner* v. *Buchner,* 260 Ill. 475; *Bonney* v. *Finch, supra*). The contestant is the moving party, and the burden is upon him to show that the ballots have been kept intact. It is not incumbent on the defendant to prove that they have been changed, and unless the contestant shows that they have been kept in such a way that there was no reasonable opportunity for tampering with them, they cannot overcome the returns. *Alexander* v. *Shaw,* 344 Ill. 389; *Haley* v. *Reidelberger,* 340 id. 154; *Kelly* v. *Brown,* 310 id. 319; *Clarke* v. *Bettenhausen,* 296 id. 373; *Strubinger* v. *Ownby, supra; Dennison* v. *Astle,* 281 Ill. 441; *Rottner* v. *Buchner, supra; Graham* v. *Peters, supra; West* v. *Sloan,* 238 Ill. 330.

The ballots were kept in the storeroom from the twenty-second day of April to the fourth day of May, 1931. This room as well as several municipal offices faced the corridor on the second floor of the bank building. Admittance to this floor was readily gained at all hours of the day and night for the street door to the building was never locked. A key to the storeroom door was kept on the wall in the city collector's office and could be seen by any person who entered the office. The use of this key was not confined to the city clerk, the city collector and their assistants, but other municipal officers and employees also used the key when they wanted stationery and supplies from the store-room. Master keys which opened the doors to the offices and storeroom on the second floor were carried by several persons. Manifestly, therefore, persons other than the city clerk, the lawful custodian, had access to the ballots during the period they were kept in the storeroom.

The evidence showed not only opportunity to tamper with the ballots but also actual interference with them. The re-count disclosed, in the fourth district, the erasure of one hundred ninety tallies, the stringing of twenty-six votes on a separate wire and the loss of one hundred fifty-three votes

by the appellee; in the sixth district, the re-sewing and re-sealing of the sack containing the ballots, the presence of dark-brown over red sealing wax, the addition of ninety-two votes for the appellant, and, in case of a number of ballots, crosses before his name peculiar in the respect that they, and not other marks upon the face, were discernible upon the back of the ballots, and in the eighth district a broken wire and seals, soiled ballots, the use of sealing wax darker in color than that used by the judges, and sixty-six additional votes for the appellant. In each of these three districts, the re-count showed no material changes in the votes for the other candidates. From eight to twenty watchers observed the counting of the ballots in each of these districts and judges, clerks and watchers alike testified that the votes for all the candidates had been correctly counted, certified and returned. When these facts and circumstances are considered, the conclusion is irresistible that the ballots from these districts were not preserved in their integrity, and that some of them had been tampered with and changed. The re-count of the ballots from the other fifteen districts disclosed no such situations as appeared in the fourth, sixth and eighth districts. All the ballots cast at the election, however, were exposed to unlawful interference while they were deposited in the storeroom; in some districts, other than the fourth, sixth and eighth, seals were broken and other suspicious circumstances shown, and all the ballots necessarily had lost their superior probative force.

The appellant answers that the irregularities of the judges and clerks of election, among others, in counting and tallying votes, in signing poll-books before the polls were closed and in failing to fold the ballots before stringing them upon a wire discredited the returns to such an extent that they should not overcome the ballots. Election officers are charged with solemn duties and there can be no justification for the irregularities to which reference has been made. Evidence tending to impeach the good faith of

any judge or clerk in counting and tallying the votes, however, was wanting. Where irregularities, such as those enumerated, do not proceed from fraud or misconduct and have no influence upon the result of the election, they will not discredit the returns. (*Graham* v. *Peters, supra; West* v. *Sloan, supra*). The sanctity of the ballot-box and the security of elections require that unimpeached returns shall prevail over ballots not only exposed to unlawful interference but actually subjected to it.

The judgment of the county court is affirmed.

*Judgment affirmed.*